# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 20-cr-20011-SHL |
| ) | |
| JEREMY LEWIS, ) | |
| Defendant. ) | |

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Before the Court is Defendant Jeremy Lewis' Motion to Suppress, (ECF No. 22), filed March 12, 2020, and the Government's Response, (ECF No. 24), filed March 25, 2020. A hearing was conducted on August 19, 2020, and Defendant filed a Supplemental Brief on September 2, 2020. (ECF. No. 45). For the following reasons, the Court **DENIES** Defendant's Motion to Suppress.

## BACKGROUND

The Indictment in this matter charges Defendant, an alleged felony convict, with unlawful possession of a firearm. (ECF No. 2.) How that firearm was seized and whether Defendant was in custody when he made statements about the firearm are central to this Motion.

On the afternoon of April 11, 2019, police received a call from Brian Evans.[1] Mr. Evans reported that two men, Defendant and his brother, Maurizio Taylor, had stood outside of his home and threatened to kill him while brandishing an AR-15. He also stated that Defendant and

---

[1] The following facts are taken from the Parties' filings and witnesses' testimonies at the hearing on August 19, 2020. The Court found the testimony offered at the hearing to be credible, unless otherwise noted.

Taylor were headed to 555 Williams Switch Road in a red car.  Officers went to both Mr. Evans' residence and 555 Williams Switch Road.

The officers who reported to Mr. Evans' home found that Mr. Evans had changed his mind.  Despite his 911 call, Mr. Evans at some point refused to cooperate or press charges.  The officers ultimately cited Mr. Evans for misusing 911.

Meanwhile, the officers who reported to 555 Williams Switch Road found two black males, Defendant and Mr. Taylor, getting out of a red car and walking into the house.  The red car was parked in, or about, the semi-circular driveway in front of the house.[2]

A few minutes after arrival, officers had cuffed and detained Defendant and Mr. Taylor.  Officer Alex Capps looked into the red car and saw an AR-15 style rifle on the back seat, in plain-view.

Officers retrieved the rifle and ran the serial number through dispatch.  Upon seeing no records associated with the rifle, nor any outstanding warrants for Defendant or Mr. Taylor, and learning after seeing the gun that Mr. Evans had decided against moving forward with his complaint, the men were released.  Officer Mullen asked who owned the gun, and Defendant responded that the rifle was his.  Officer Mullen then informed him that the gun safety was missing and Defendant should attend to it.  Defendant responded that the gun safety was in the house and he would affix it to the gun that evening.  The officers either placed the rifle on the hood of the vehicle or handed it to Defendant and left the scene.

---

[2] The Court heard slightly conflicting testimonies about the car's position, which is addressed further infra.

Later that day, the officers realized that Defendant, a convicted felon, could not lawfully possess a firearm. So, they secured a warrant for him, arrested him sometime later, and eventually seized the rifle.

Regarding the location of the red car, the Court heard varied testimony. The first witness, Officer Sam Parker, testified that the car was in the grass, directly in front of the house, between the house and the driveway. The circle Officer Parker drew on Exhibit 1 situates the car immediately in front of the house.

The second witness, Alex Capps, now former Police Officer with the Ripley Police Department, testified that the car was in the driveway. This conflicts with Officer Parker's testimony. The third witness, Officer Timothy Mullen, testified that the car was parked on the grass, but he was unsure whether it was in the grass closer to the home or the grass on the other side of the driveway that was closer to the street.

Although the exact location of the parked car ultimately does not control the outcome of this Motion, Officer Parker's testimony is given the most weight, as he testified most confidently about the details of the day and that testimony is the most favorable to Defendant. The testimonies of Officer Mullen and Mr. Capp were a little less clear on the point of where the car was parked. Accordingly, the Court finds that the car was parked on the grass closer to the house.

For the purposes of this Motion, Defendant seeks to suppress the AR-15 as well as the statements he made to Officer Mullen regarding the AR-15.

**ANALYSIS**

A.   Admissibility of the AR-15

Defendant first argues that the AR-15 seized by Officer Capps should be suppressed because it was obtained by an unlawful search. The Fourth Amendment provides that the "right

of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Fourth Amendment imposes a per se requirement that police officers obtain a warrant prior to conducting a search. See Maryland v. Dyson, 527 U.S. 465, 466 (1999). Yet, exceptions to this warrant requirement include searches of vehicles, id., and objects found in plain view, Minnesota v. Dickerson, 508 U.S. 366, 375.

The seizure of the AR-15 involves both of these exceptions, and the Government relies on both in response to the Motion. As for the plain-view doctrine, police may seize an object only if (1) the police are lawfully in a position from which they view the object, (2) the object's incriminating character is immediately apparent and (3) the police have a lawful right of access to the object. United States v. Galaviz, 645 F.3d 347, 355 (6th Cir. 2011). And, here, in addition to being a basis for the search on its own, the automobile exception impacts the third prong of the plain-view doctrine—a lawful right of access. The automobile exception provides that police are permitted to search a vehicle "so long as they have probable cause to do so." Collins v. Virginia, 138 S. Ct. 1663, 1675 (2018).

But there are clear limits to the automobile exception—the home and its curtilage. As the Supreme Court held in Collins, the automobile exception does not permit a warrantless search if the vehicle is in the curtilage of a home. Id. ("[W]e conclude that the automobile exception does not permit an officer without a warrant to enter a home or its curtilage in order to search a vehicle therein.").

The Court first examines the automobile and plain-view exceptions and then examines whether the car was in the curtilage of the home, which would defeat the exceptions to the warrant requirement.

1. Automobile Exception and Plain-View Doctrine

Under the automobile exception, police officers are permitted to undertake a warrantless search of a vehicle "if they have probable cause to believe that the vehicle contains evidence of a crime." Galaviz, 645 F.3d at 355 (citation omitted). Even if the car is not "immediately mobile," "the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the [automobile] exception." Id. (quoting California v. Carney, 471 U.S. 386, 390-91 (1985)). Here, there is ample evidence that the officers had probable cause to believe that the car contained evidence of a crime.

As detailed above, Mr. Evans called the police and described two men, standing outside of his home, who threatened to kill him while brandishing an AR-15. He also stated that the assailants were headed to 555 Williams Switch Road in a red car. Police officers who reported to 555 Williams Switch Road found Defendant and Mr. Taylor getting out of a red car and walking to the house. Mr. Capps testified that, after arriving at the scene, he looked into the parked red car and saw an AR-15 style rifle on the back seat, in plain-view. The AR-15 style rifle matched the description Mr. Evans provided of the gun used to assault him. The facts demonstrate, and Defendant does not dispute, that the officers had probable cause to believe that the AR-15 rifle observed in the red car was evidence of a crime. Thus, the Court finds that the automobile exception applies and Officer Capps' search of the car was lawful.

While the automobile exception alone permits this search, we also examine the plain-view doctrine, relied on by the Government as support for the seizure. "[U]nder the plain-view doctrine, any valid warrantless seizure of incriminating evidence requires that the officer have a lawful right of access to the object itself." Collins, 138 S. Ct. at 1672. To determine if a warrantless seizure is lawful based on plain-view, courts review the following factors: (1) whether police are lawfully in a position from which to view an object, (2) if the object's

5

incriminating character is immediately apparent, and (3) if the officers have a lawful right of access to the object. Galaviz, 645 F.3d at 355. If these factors are satisfied, the officers may seize the object. Id.

First, the Court finds that the officers' presence at 555 Williams Switch Road was lawful. As addressed supra, Mr. Evans reported that two men threatened him with an AR-15 and were headed to 555 Williams Switch Road in a red car. Police officers reported to that location to investigate the alleged aggravated assault. Once there, the officers approached Defendant, Mr. Taylor, and the red car on the grass area between the driveway and the house. The officers properly reported to 555 Williams Switch Road to investigate the alleged crime.

Next, there is no question that the incriminating character of the AR-15 style rifle was readily apparent. Upon looking into the red car, Officer Capps observed an AR-15 style rifle on the back seat, which matched the description of the weapon Mr. Evans said had been used to assault him.

Finally, Officer Capps had a lawful right of access to enter the red car because a warrantless search was appropriate under the automobile exception. See id. at 357 ("whether the officers had a lawful right of access to the interior of the locked car so as to seize the gun . . . turns on application of the automobile exception"). As already established, the officers had probable cause to be at 555 Williams Switch Road, and, under the automobile exception, Officer Capps was permitted to conduct a warrantless search of the car.

Given that the Court finds that the automobile and plain-view exceptions apply, the Court next examines whether the car was in the curtilage, which would render the warrantless search and seizure unlawful.

2. Curtilage

The curtilage—"the area immediately surrounding and associated with the home"—is "part of the home itself for Fourth Amendment purposes." California v. Ciraolo, 476 U.S. 207, 212-213 (1986). "The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." Id. And more specific to the facts here, "searching a vehicle parked in the curtilage involves not only the invasion of the Fourth Amendment interest in the vehicle but also an invasion of the sanctity of the curtilage." Collins, 138 S. Ct. at 1672. The defendant bears the burden to show his legitimate expectation of privacy in the area searched. See United States v. Mathis, 738 F.3d 719, 729 (6th Cir. 2013).

Courts look to four factors to evaluate whether an area surrounding the home constitutes curtilage: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. United States v. Dunn, 480 U.S. 294, 301 (1987).

The first factor largely favors Defendant. The grass area between the house and the driveway is directly adjacent to the house, which is where Officer Parker testified that the car was located. Thus, there is an inference that the grass area should be treated "as an adjunct of the house." Id. at 302; see United States v. Cousins, 455 F.3d 1116, 1122 (10th Cir. 2006) (a sideyard that was "immediately adjacent to the house" satisfied the first factor).

The remaining factors—whether the area is enclosed, the nature of the area, and steps taken to protect the area from observation—are not supported or developed in the record and thus weigh against Defendant. Specifically, there is no evidence in the record that the grass area between the house and the driveway was enclosed, was used for any activity associated with

7

curtilage, see Cousins, 455 F.3d at 1123 (discussing how gardening may lie within curtilage because it suggests the area is used for "intimate activities of the home"), or that any physical measures (e.g. hedges or tarps) protected the area from observation.  Rather, a photo admitted into evidence at the suppression hearing shows that the grass area between the house and the driveway was not enclosed and had no visible physical measures to protect it from observation.  Whether the photo shows that the grass area was used in any activity associated with curtilage, such as gardening, is unclear, but the record does not suggest any such activity.

On these facts, the Court finds that Defendant has not met his burden to show that the car was located in the curtilage of the home.  Accordingly, the Court finds that the officers' warrantless search of the car and seizure of the AR-15 was lawful, and Defendant's Motion to Suppress the AR-15 is **DENIED**.

B. Admissibility of Defendant's Statements About the AR-15

Defendant next argues that he was "in custody" when Officer Mullen asked Defendant and Mr. Taylor who owned the AR-15, and that Defendant should have been Mirandized at some point prior to Officer Mullen's questioning.  As such, Defendant argues that his inculpatory answer and subsequent responses—that the gun was his and he knew he needed to fix the safety—must be suppressed.

The Fifth Amendment provides that no person will be compelled in a criminal case to serve "as a witness against himself."  U.S. Const. amend. V.  To ensure this privilege is protected, law enforcement officers are required to inform a person of a number of rights, including that he has a right to remain silent, before he is subjected to a custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 467–68 (1966).  Not all incriminating statements are subject to Fifth Amendment scrutiny, however.  "Statements made freely and voluntary, without compulsion, are not barred by the Fifth Amendment and are admissible in evidence."  United

8

States v. Taylor, No. 2:19-CR-20046-MSN, 2020 WL 1676806, at *4 (W.D. Tenn. Apr. 6, 2020) (citing Miranda, 384 U.S. at 478).  A defendant seeking to suppress a statement has the burden to establish that his interrogation was custodial.  United States v. Rodriguez–Suazo, 346 F.3d 637, 643 (6th Cir. 2003).

To determine if a question was part of a custodial interrogation, courts look at the totality of the circumstances "to determine how a reasonable man in the suspect's position would have understood the situation."  United States v. Swanson, 341 F.3d 524, 528 (6th Cir. 2003) (internal citation omitted).  The custody inquiry "is objective: courts ask whether the police arrested the suspect or otherwise restricted his freedom of movement as though he were under arrest." United States v. Butler, 790 F. App'x 782, 784 (6th Cir. 2019), cert. denied, 207 L. Ed. 2d 150 (May 26, 2020).  Factors in the analysis include: "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." United States v. Panak, 552 F.3d 462, 465 (6th Cir. 2009).

The first and second factors do not favor Defendant.  The exchange with Officer Mullen was not at a police station, generally the site of a custodial encounter, id., but instead in front of Defendant's home.  An encounter in the home is generally the least likely to be found to be custodial, see id. ("an in-home encounter between the police and a citizen generally will be non-custodial"), and, while the exchange with Officer Mullen did not occur inside the home, it occurred in the yard in front of the home.

A noncustodial encounter in the home or elsewhere can become custodial, however, depending on the length and manner of questioning.  "The number of officers, the show of authority, the conspicuous display of drawn weapons, the nature of the questioning, all may

9

transform one's castle into an interrogation cell . . . ." Id. But here, the nature of the questioning progressed in an environment that shifted in the opposite direction—potentially custodial to noncustodial. Defendant was cleared of wrongdoing and his handcuffs were removed. See United States v. Warner, 971 F.2d 1189, 1202 (6th Cir. 1992) (no custodial setting when defendant was not under arrest or restraint, "even though she was a suspect"). No longer a suspect, Defendant had a short and casual exchange with Officer Mullen, in which Officer Mullen was seeking to determine who owned the gun so that he could return it. Officer Mullen's question does not suggest a custodial interrogation. He simply wanted to return the gun to its owner.

Additionally, the exchange consisted of only a few sentences regarding the gun's owner and the gun's safety. See United States v. Hinojosa, 606 F.3d 875, 883 (6th Cir. 2010) ("The interview was of short duration—lasting only a few brief questions—and there is nothing to suggest that the officers acted in a hostile or coercive manner. No weapons were drawn, nor were any threats made."). The length of the exchange was considerably shorter than interrogations this Circuit has nevertheless still found were noncustodial. See Panak, 552 F.3d at 467 (finding that exchange between 45 minutes and an hour did not suggest a custodial interrogation);

Moreover, Defendant was never told that he was under arrest. See United States v. Flack, No. 3:08-CR-108, 2009 WL 5031320, at *6 (E.D. Tenn. Dec. 11, 2009) ("In the present case, the officers did not threaten to arrest anyone."). That he was not specifically told that he was *not* under arrest is not dispositive, but "merely one factor among many." Hinojosa, 606 F.3d at 883 ("Although the officers did not advise Defendant that he was not under arrest, their failure to do so does not automatically render the encounter custodial.").

Defendant relies primarily on the third and fourth factors, arguing that he did not have unrestrained movement and was never informed that he did not need to answer questions. Defendant urges that, even though the questioning and inculpatory statements were made after his handcuffs were removed, he was still "in custody" because he was not yet free to walk away or get into his vehicle and drive away.

The fourth factor does favor Defendant, as there is no evidence in the record that he was informed that he did not need to answer questions. But this factor alone is not dispositive. Panak, 552 F.3d at 467 (finding that this advice is "one factor among many, and we have never held that it is a necessary condition (as opposed to a frequently sufficient condition) before officers may question an individual in a non-custodial setting") (internal citation omitted).

And Defendant's argument as to the third factor is unsuccessful. At the time of his exchange with Officer Mullen, Defendant had been cleared of wrongdoing and was no longer handcuffed. Further, he was not boxed into a location where he could not access an exit, and there is no evidence that he was intentionally placed or maneuvered in a way to restrain his movement. See United States v. Saylor, 705 F. App'x 369, 375-76 (6th Cir. 2017) (police officers' seating in front of the only exit in defendant's kitchen during questioning did not automatically render the questioning custodial). Overall, Defendant does not show, and the record does not demonstrate, that he was restrained "in any significant way" during his brief exchange with Officer Mullen. See id. at 376. Thus, the Court cannot find that a reasonable man in Defendant's position would have understood that he was still in custody when he made the statements in question. See Hinojosa, 606 F.3d at 883-84 ("the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.") (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)).

Based on the totality of the circumstances, the Court finds that Defendant was not in custody when he made the statements about the gun. Defendant's Motion to Suppress those statements is **DENIED**.

## **CONCLUSION**

For these reasons, Defendant's Motion is **DENIED**.

**IT IS SO ORDERED,** this 14th day of September, 2020.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE